UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF LIVONIA,

               Plaintiff,                             Case No. 20-10737

v.

                                        HON. MARK A. GOLDSMITH

AQUATIC RENOVATION SYSTEMS, INC.,
D/B/A RENOSYS CORPORATION, et al.,

               Defendants.

_____/

**OPINION & ORDER
(1) GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A RESPONSE TO
DEFENDANT MERCHANTS BONDING COMPANY'S CONCURRENCE AND
SUPPLEMENTAL REPLY (Dkt. 45), (2) DENYING PLAINTIFF'S MOTION FOR
LEAVE TO FILE A RESPONSE TO DEFENDANT AQUATIC RENOVATION
SYSTEM'S REPLY (Dkt. 46), AND (3) DENYING DEFENDANT AQUATIC
RENOVATION SYSTEM'S MOTION TO DISMISS AS A SANCTION FOR
SPOLIATION, MOTION TO DISQUALIFY PLAINTIFF'S EXPERT, MOTION TO
STRIKE THE EXPERT'S REPORT, AND MOTION FOR SUMMARY JUDGMENT
(Dkt. 35)**

    This matter is before the Court on two motions filed by Plaintiff City of Livonia and four

motions filed by Defendant Aquatic Renovation Systems, Inc. d/b/a RenoSys Corporation

(RenoSys).  The City filed a motion for leave to file a response to Defendant Merchants Bonding

Company's (Merchants') concurrence with RenoSys's reply and supplemental reply (Dkt. 45).  It

also filed a motion for leave to file a response to RenoSys's reply (Dkt. 46).  Renosys filed a

motion to dismiss as a sanction for spoliation, motion to disqualify the City's expert, motion to

strike the expert's report, and motion for summary judgment (Dkt. 35).[1]  For the foregoing reasons,

---

[1] RenoSys filed all of these motions in a single document.

the Court grants the City's motion for leave to file a response to Merchants' reply and denies the City's motion to file a response to RenoSys's reply. It denies each of RenoSys's motions.[2]

## I. BACKGROUND

This action arises from RenoSys's installation of a pool liner in one of the City's pools. Compl. (Dkt. 1). In 2019, the City opened a bid process, through which it accepted proposals for conducting work on a large leisure pool located in a recreation center that the City owns and operates. Scope of Work (SOW)-1 (Dkt. 35-1). The pool has lap lanes; a zero-depth entry; a lazy river, which has moving water that creates a current that one can swim against or float along; a plunge area; a "vortex," which has water that moves in a circular motion; and a bubble bench. Davis Dep. at 11–12 (Dkt. 35-1). The Scope of Work stated that all projects must be complete by August 31, 2019. SOW-1.

The City awarded RenoSys a contract to install a 60-millimeter PVC liner in the pool, and on March 11, 2019, the City and RenoSys entered into a contract that provided that RenoSys would install the liner in the pool. Aquatic Renovation Systems Contract (Dkt. 41-2).[3] The City's pool had previously been lined with marcite, which is a plaster-like compound. Davis Dep. at 9. RenoSys completed the installation of the liner in early September 2019. Id. at 38.

_____

[2] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motions, the briefing includes the following: the City's response to the motions (Dkt. 41), Merchants' notice of joinder/concurrence in the motions (Dkt. 36), the City's response to the notice of joinder/concurrence (Dkt. 42), RenoSys's reply (Dkt. 43), Merchants' concurrence with RenoSys's reply and supplemental reply (Dkt. 44), and the City's response to Merchants' concurrence with RenoSys's reply and supplemental reply (Dkt. 45-1).

[3] The contract specifically provided that RenoSys would install a new "RenoSys Rec Dec," new deck drains, a pool floor, and pool gutters. Id.

The day after the installation was complete, the City contacted RenoSys and reported that the liner was "bubbling" in certain areas of the pool.  Emails Between Stephanie Manoogian and Tyler Blattner at PageID.131 (Dkt. 35-1).  RenoSys dispatched Tom Krepel, the lead installer for the project, to the pool.  11/13/19 Letter to Michael Fisher from Jeffery Wells at PageID.136 (Dkt. 35-1).  Krepel informed Stephanie Manoogian, the Aquatics Supervisor for the City, that the bubbling was likely trapped air underneath the liner, which is common after a pool with a new liner has first been refilled, and that this bubbling usually dissipates.  Id.  In addition, Manoogian informed Tyler Blattner, an operations manager at RenoSys who helped oversee the installation, of the bubbling in an email and phone call.  Manoogian Dep. at 12 (Dkt. 35-1).  Blattner offered the same explanation as Krepel, stating that the bubbling was likely trapped air, which is common and would dissipate.  Emails Between Stephanie Manoogian and Tyler Blattner at PageID.133.  Krepel and Blattner also described to the City a process it could use to remove air from underneath the liner.  Manoogian Dep. at 12.  The bubbling in the zero-depth entry was in fact air, and the City was able to remove it.  Id. at 13.  However, the bubbling in the vortex and plunge area grew larger, and Manoogian and other City employees deemed it noticeable that water was underneath the liner.  Id.

In September 2019, Krepel visited the pool again, and he stated that the bubbling in the vortex and plunge area was due to water underneath the liner.  Id. at 12–13; Davis Dep. at 39–40.  Krepel recommended that the pool staff shut down the lazy river and vortex pump and see what effect this had on the accumulation of water.  Davis Dep. at 52; Krepel Dep. at 65 (Dkt. 35-1).  He also recommended that the City retain a testing company to perform a pressure test.  Davis Dep. at 14.  In addition, RenoSys requested that the pool be drained to fully evaluate the issue with the liner, and the City and RenoSys determined dates on which the pool would be closed, drained, and

examined.  11/13/19 Letter to Michael Fisher from Jeffery Wells at PageID.136.  In mid-October 2019, the liner separated from the bottom of the pool, requiring RenoSys to visit and examine the pool earlier than initially planned.  Davis Dep. at 44.  RenoSys checked seams, replaced flanges, and pumped water out from underneath the liner.  Davis Dep. at 47; 11/13/19 Letter to Michael Fisher from Jeffery Wells at PageID.137.

The City hired a company to perform a pressure test after it drained the pool.  Manoogian Dep. at 14.  The pressure test revealed a buried water-return inlet, which had been covered over with marcite.  Id.  Both the City and RenoSys were previously unaware of this water-return inlet.  Id. at 15.  The inlet was uncovered and sealed with a flange.  Baruzzini Aquatics Report (Dkt. 41-4).

The City then refilled the pool in early November.  Manoogian Dep. at 16.  Within 24–36 hours of refilling the pool, the vortex and plunge area again showed signs of bubbling in the same places as the initial bubbling appeared.  Id. at 16–17.

RenoSys returned to the pool in January 2020, and it performed testing and replaced flanges.  Jan. 2020 Service Records (Dkt. 41-8).  After the repairs, the City refilled the pool.  Email Communications at 79 (Dkt. 41-3).  Within 24 hours of refilling the pool, bubbling appeared under the liner in the vortex and plunge area.  Id.  Jeffery Wells, the vice president of operations at RenoSys, informed Stephanie Manoogian that he wanted to schedule a leak detection company to visit the pool because the issues appeared to be due to a "pressurized source."  Id. at 80.  American Leak Detection visited the pool and performed testing on the pool while it was filled.  ALD Records (Dkt. 41-6).  This test involved injecting a dye between the old marcite floor and walls in the pool and the commercial liner so that dye would emerge at leaking points in the liner.  Id. at 1.  American Leak Detection reported that, although its test did not cover the entire pool, dye emerged at different areas, indicating that they were not completely sealed.  Id.

4

RenoSys returned to the pool later in January.  Email Communications at 91.  It removed and resealed all flanges and termination strips, and it resealed all seams.  Id. at 88.  According to the City, however, after a total of four repairs, RenoSys was unable to resolve the bubbling, and the pool was not fully operational.  Manoogian Dep. at 42; 2/5/20 Letter to Jeffery Wells from Michael Fisher at PageID.183 (Dkt. 35-1).

On February 4, 2020, the City made a claim on the performance bond issued by Merchants for the amount necessary to satisfactorily complete the pool.  2/4/20 Letter to Larry Taylor from Michael Fisher at PageID.181 (Dkt. 35-1).   On February 5, 2020, the City formally requested that RenoSys leave the worksite and told RenoSys that it was terminating their relationship.  2/5/20 Letter to Jeffery Wells from Michael Fisher at PageID.183.  The City ultimately removed the liner and hired another company to remarcite the pool.  Davis Dep. at 81; Manoogian Dep. at 45.

The City brings claims of breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness.  Compl. ¶¶ 8–52.  It also alleges that RenoSys obtained a performance bond from Merchants as surety and that, pursuant to the performance bond, Merchants is obligated to compensate the City for the damages it sustained as a result of RenoSys's failure to perform.  Id. ¶¶ 55, 61.

## II. ANALYSIS

The Court first discusses the City's motions for leave to file responses to Defendants' replies.  It then discusses RenoSys's motions.

### A. Motion to File Response to Merchants' Concurrence and Supplemental Reply and Motion to File Response to RenoSys's Reply

The City seeks leave to file a response to Merchants' concurrence and supplemental reply, asserting that in the concurrence and supplemental reply, Merchants for the first time offers arguments and evidence in support of its contention that it is entitled to summary judgment on the

performance bond claim.  Mot. for Leave to File Resp. to Merchants' Concurrence and Supp. Reply at 3.  The City also seeks leave to file a response to RenoSys's reply, stating that in the reply, RenoSys offers arguments beyond those included in its motion for summary judgment.  Mot. for Leave to File Resp. to RenoSys's Reply at 3.  According to the City, these new arguments are that, because the City removed the liner from the pool, RenoSys could not have its experts inspect the liner and pool together and that the Court should grant summary judgment on the performance bond claim.  Id.

The decision to grant or deny leave to file a sur-reply—which describes what the City seeks to file—is committed to the court's discretion.  Mirando v. U.S. Dep't of Treasury, 766 F.3d 540, 549 (6th Cir. 2014).  A sur-reply may be appropriate "[w]hen new submissions and/or arguments are included in a reply brief, and a nonmovant's ability to respond to the new evidence has been vitiated."  Key v. Shelby Cnty., 551 F. App'x 262, 265 (6th Cir. 2014) (punctuation modified).  When the moving party submits in a reply brief new reasons and evidence in support of its motion for summary judgment, the district court should allow the nonmoving party an "adequate opportunity" to respond.  Seay v. Tenn. Valley Auth., 339 F.3d 454, 481 (6th Cir. 2003).

Because Merchants offers in their reply new evidence and arguments related to the performance bond claim, to which the City should be afforded an adequate opportunity to respond, the Court grants the City's motion for leave to file a response to Merchants' reply.  RenoSys, however, does not offer new evidence or arguments in its reply.  In its motion for summary judgment, it contended that the City's removal of the pool liner precluded it from having an expert evaluate the pool with the liner in place, while the pool was filled and emptied.  See Mot. at 11.  It also argued that summary judgment was warranted on the performance bond claim because the claim was premised on the assertion that the poor quality of the materials and workmanship

constituted a failure to perform, and there was nothing in the record to support that assertion.  <u>Id.</u> at 24.  Therefore, the Court denies the City's motion for leave to file a response to RenoSys' reply. <u>See</u> <u>Modesty v. Shockley</u>, 434 F. App'x 469, 472 (6th Cir. 2011) (affirming a district court's denial of leave to file a sur-reply when the opposing party's reply did not offer new arguments or introduce new evidence).

Next, the Court turns to RenoSys's motions.  It addresses each of RenoSys's motions in turn.

### B.  Motion to Dismiss as a Sanction for Spoliation

RenoSys contends that the City engaged in spoliation when it removed the liner from the pool before giving RenoSys the opportunity to have an expert perform a full evaluation of the pool with the liner in place—and that this removal prejudiced RenoSys.  Mot. at 9–13.  It states that the City's theory of liability is either that the liner itself was faulty or that the liner was improperly installed, but that either theory can be assessed only by examining the liner and the pool together, while the pool is both filled and emptied.  <u>Id.</u> at 10.  As a sanction for spoliation, it seeks dismissal of the case with prejudice pursuant to the Court's inherent powers.  <u>Id.</u> at 12–13.

"Spoliation is defined as the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction."  <u>United States v. Boxley</u>, 373 F.3d 759, 762 (6th Cir. 2004).  If a party destroys evidence in anticipation of litigation, district courts have inherent authority to impose sanctions based on spoliation of evidence.  <u>Applebaum v. Target Corp.</u>, 831 F.3d 740, 744 (6th Cir. 2016).  Federal law governs spoliation issues in a case pending in federal court.  <u>Adkins v. Wolever</u>, 554 F.3d 650, 651 (6th Cir. 2009).

The United States Court of Appeals for the Sixth Circuit has explained that a district court may sanction a litigant for spoliation of evidence if three conditions are met.  <u>Byrd v. Alpha Alliance Ins. Corp.</u>, 518 F. App'x 380, 383–384 (6th Cir. 2013).  First, the party with control over the

evidence had an obligation to preserve the evidence at the time of its destruction.  Id. at 384.  A party has an obligation to preserve evidence when it "should have known that the evidence may be relevant to future litigation."  Beaven v. U.S. Dep't of Justice, 622 F.3d 540, 553 (6th Cir. 2010).  Second, the evidence was destroyed with a culpable state of mind.  Byrd, 518 F. App'x at 384.  "The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently."  Beaven, 622 F.3d at 554 (punctuation modified).  Third, the destroyed evidence was relevant to a claim or defense.  Byrd, 518 F. App'x at 384.  Evidence is relevant to the other side's claim or defense if the evidence is such that "a reasonable trier of fact could find that it would support that claim or defense."  Id.  The party seeking the sanction carries the burden of establishing these facts.  Id.

When the above conditions are met, federal courts have "broad discretion to craft proper sanctions for spoliated evidence."  Adkins, 554 F.3d at 651.  The Sixth Circuit has explained that dismissal as a sanction for spoliation—which RenoSys seeks—is a "particularly severe sanction" that is "usually justified only in circumstances of bad faith or other like action."  Arch Ins. Co. v. Broan-NuTone, LLC, 509 F. App'x 453, 458 (6th Cir. 2012).  When the conduct is less culpable, dismissal as a sanction may be appropriate, but it "should rarely be imposed and only when significant prejudice results from the evidence's destruction."  Byrd, 518 F. App'x at 386.  For example, under the "extreme circumstance[e]" in which spoliation denies a defendant access to "the only evidence from which it could develop its defenses adequately," dismissal of an action may be a proper sanction.  Arch Ins. Co., 509 F. App'x at 458 (punctuation modified).

The City contends that it did not engage in spoliation because the liner remains in storage and available for inspection.  Resp. at 10.  It also states that it removed the liner because, after six

months of waiting for RenoSys to fix the water underneath the liner with no resolution, it wanted to render the pool fully usable to the public.  Id. at 12.

The City had an obligation to preserve the liner because it should have known that the liner may be relevant to future litigation, and that the liner is relevant to RenoSys's claim or defense. However, even if the City did engage in spoliation by knowingly or negligently removing the liner from the pool, such a degree of fault would not merit the severe sanction of dismissal.  RenoSys contends that the City knew this matter was headed for litigation when it removed the liner from the pool.  Mot. at 12.  But it does not state, and there is no evidence to otherwise indicate, that the City acted in bad faith in removing the liner.  And RenoSys has not shown that the City's actions were so prejudicial that they substantially denied RenoSys the ability to defend itself.  RenoSys asserts that it cannot have an expert test the pool and liner together.  But before the City filed this action, RenoSys had multiple opportunities over approximately six months to inspect the pool and liner together, while the pool was filled and empty.  RenoSys had employees onsite who could have—and did—attempt to determine the cause of the water underneath the liner and fix it.

In contending that dismissal is appropriate when significant prejudice results from the destruction of evidence, RenoSys relies on Bloemendaal v. Town & Country Sports Ctr., Inc., 659 N.W.2d 684 (Mich. App. 2002).  In that case, the plaintiff was injured while driving a motorcycle that she purchased from defendants.  Id. at 685.  While disassembling the motorcycle, plaintiff's experts failed to test a certain part of the motorcycle that was essential to their ultimate theory of liability.  Id. at 687.  The Michigan Court of Appeals held that, because the test could no longer be duplicated, the failure to conduct the test constituted a failure to preserve evidence.  Id.  It also held that the trial court did not abuse its discretion in dismissing the case as a sanction for spoliation based on the resulting prejudice to the defendant, noting that, "[b]ecause defendants were not

present at the time of the disassembly, they were precluded from gaining [the] evidence [from the test] on their own."  Id. at 688.

This case is distinguishable, as the liner was not destroyed before RenoSys had an opportunity to inspect it.  RenoSys was present at the pool multiple times for the purpose of inspecting the liner, and, therefore, it was not precluded from gaining evidence or testing the pool and liner together on its own.

Accordingly, the Court denies RenoSys's motion to dismiss as a sanction for spoliation.

**C.  Motion for Disqualification of the City's Expert**

RenoSys also filed a motion pursuant to Federal Rule of Evidence 702 requesting that the Court find the City's expert, Richard Story, unqualified, and preclude the City from relying on Story's unreliable opinions or findings.  Mot. at  13–18.

Story is a professional pool installer.  Story Dep. at 10 (Dkt. 35-1).  The City contacted him based upon a recommendation from Baruzzini Aquatics, which conducted the pressure test in the pool in 2019.  John Robertson Aff. at 3 (Dkt. 41-12).  The City informed Story that it had water under the liner and asked him to inspect the pool.  Story Dep. at 17.

Story visited the City's pool in early 2020 when the liner was still installed and after RenoSys's last attempted repair.  Id. at 18.  He observed that "there was a lot of water under the liner," inspected areas that he thought would permit water to get underneath the liner, and found several such areas.  Id. at 19.  Story identified what he considered to be several issues with RenoSys' installation of the liner, including: (i) numerous cracked faceplates—used to make a watertight seal—that would allow water to get underneath the liner; (ii) lack of gaskets—used to create a mechanical bond between the PVC liner and the floor—in the pool, including around the main drain, which is particularly likely to contribute to water underneath the liner; (iii) another gasket

10

that was not properly adhered to the floor or to the liner itself; (iv) the termination of the liner below the waterline; (v) the use of plastic anchors that were not epoxied; and (vi) excessive use of silicone in the vortex area to prevent leaking.  Id. at 21–24, 28–29, 31.  In addition, Story stated that he observed uneven cuts in the liner and lack of quality and workmanship.  Id. at 45–46.  Story inspected the pool while it was empty, and he testified that it would not have been useful to inspect the pool while it was filled to help determine the source of any potential leak.  Id. at 19.

According to Story, there are three ways that water may get behind a vinyl liner: (i) plumbing, (ii) groundwater, and (iii) leaks in the liner.  Id. at 52–53.  Story stated that plumbing is "first and foremost at the top of the list" and that a pressure test is used to identify whether plumbing is the source of a leak.  Id. at 52.  The City asserts that Baruzzini's and American Leak Detection's testing had already ruled out plumbing as a cause for the liner bubbling.  Resp. at 16.  And, according to Story, because the pool is inside, groundwater was likely not the cause.  Story Dep. at 52–53.  Therefore, the City relies on Story's testimony to establish that leaks in the liner were the source of the bubbling.

The testimony of experts is governed by Federal Rule of Evidence 702.  That rule states the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Sixth Circuit has identified three requirements for an expert's testimony to be admissible under Rule 702. In re Scrap Metal Antitrust Litig., 527 F.3d 517, 528–529 (6th Cir. 2008). First, "the witness must be qualified by knowledge, skill, experience, training, or education." Id. at 529 (punctuation modified). Second, "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue." Id. (punctuation modified). Third, "the testimony must be reliable." Id. The party offering the expert testimony must prove the expert's qualifications by a preponderance of the evidence. See Sigler v. Am. Honda Motor Co., 532 F.3d 469, 478 (6th Cir. 2008).

"[R]ejection of expert testimony is the exception, rather than the rule." In re Scrap Metal, 527 F.3d at 530. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 596 (1993). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." Davis v. Combustion Eng'g, Inc., 742 F.2d 916, 919 (6th Cir. 1984).

RenoSys contends that Story is not qualified and that his conclusions were not based on reliable principles and methods. The Court first discusses Story's qualifications and then discusses reliability. It finds that Story is qualified and that his testimony is reliable.

### 1. Qualifications

Before an expert may give an opinion, the witness must be qualified to do so. Berry v. City of Detroit, 25 F.3d 1342, 1348–1350 (6th Cir. 1994). To establish an expert's qualification, the proponent of the testimony must establish those factors related to the expert's "background that mak[e] [his or her] knowledge 'specialized,' that is, beyond the scope of the ordinary juror."

12

Zuzula v. ABB Power T & D Co., Inc., 267 F. Supp.2d 703, 713 (E.D. Mich. 2003).  In addition, those qualifications must be relevant to the opinion sought.  Id.  Courts determine whether the witness is qualified to testify about a particular issue by looking to the witness' "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The question is not whether an expert is "the best qualified expert [p]laintiffs could have called upon" but rather whether the expert "[meets] Rule 702's basic qualifications requirement."  Burgett v. Troy-Bilt LLC, 579 F. App'x 372, 378 (6th Cir. 2014).

To determine whether Story's qualifications meet the requirements of Rule 702, the Court first must evaluate "the purpose for which the testimony is offered."  Meemic Ins. Co. v. Hewlett-Packard Co., 717 F. Supp. 2d 752, 762 (E.D. Mich. 2010).  "The issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."  Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994).  The City offers Story's expert opinion on two issues: (i) whether leaks in the liner were the source of the water behind the liner, and (ii) whether the liner was improperly installed.  Accordingly, Story must be qualified to provide expert opinions as to those two issues.

Story is the president and owner of R. Story Development, which installs pool liners and does landscape construction.  Story Dep. at 10.  Eighty percent of the company's business consists of landscape construction, and 20 percent consists of the installation of pool liners.  Id. at 11.  Story estimates that his company installs an average of zero to four commercial pool liners per year and the same number of residential liners per year.  Id.  He has been installing pool liners for about eight to nine years.  Id. at 12.  He has a certification through Elbtal USA, a supplier of 60-millimeter pool membranes, which is the same type of liner that RenoSys installs.  Id. at 6.  The certification

involved learning Elbtal's techniques for installing pool liners, doing hands-on work, and passing a test.  Id. at 7.

RenoSys notes that, in his deposition, Story stated that he does not consider himself an expert. Mot. at 14 (citing Story Dep. at 8).  However, "that self-assessment is, standing alone, insufficient to conclude that [an expert] may not give expert testimony on specific causation."  Thomas v. Novartis Pharm. Corp., 443 F. App'x 58, 62 (6th Cir. 2011).  RenoSys also seems to challenge Story's qualifications based on the fact that he has a high school degree and that he has never installed a liner in a pool with features such as a vortex and lazy river.  Mot. at 14.  But "[a]n expert can be qualified even without a relevant diploma."  Buren v. Crawford Cnty., No. 13-cv-14565, 2016 WL 5369597, at *2 (E.D. Mich. Sept. 26, 2016).  Lack of academic training, a college degree, and previous expert witness experience does not render expert testimony inadmissible.  See Zuzula v. ABB Power T & D Co., Inc., 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003).  Likewise, an expert "need not have complete knowledge about the field in question."  Mannino v. Int'l Mfg. Co., 650 F.2d 846, 850 (6th Cir. 1981).  Rather, the expert "need only be able to aid the jury in resolving a relevant issue."  Id.

Story's training and experience installing residential and commercial pool liners for eight to nine years qualify him to offer opinions on the source of the water underneath the liner in the City's pool and the installation of the liner.  See Rose v. Truck Ctrs., Inc., 388 F. App'x 528, 534 (6th Cir. 2010) (finding that proffered expert's "experiences as a mechanic give him specialized knowledge in the areas of truck mechanics and steering gears"); In re E.I. du Pont de Nemours & Co. C-8 Personal Inj. Litig., 345 F. Supp. 3d 897, 902 (S.D. Ohio 2015) ("It is well established that experience-based testimony satisfies Rule 702 admissibility requirements.").  This training and experience give him specialized knowledge—meaning knowledge that is "beyond the scope

of the ordinary juror," see Zuzula, 267 F. Supp. 2d at 713—in the installation of 60-millimeter pool liners and the various features of such liners. This knowledge can assist the trier of fact in understanding the evidence in this case.

The scope of Story's expertise—such as whether he has experience installing liners in pools with specific features found in the City's pool—goes to the weight and credibility of his testimony, rather than its admissibility. See First Tenn. Bank Nat'l Ass'n v. Barreto, 268 F.3d 319, 333 (6th Cir. 2001) ("[T]o the extent that [the expert] may have lacked familiarity with some aspects of banking relationships, the district court correctly reasoned that such unfamiliarity merely affected the weight and credibility of his testimony, not its admissibility."); Dilts v. United Grp. Servs., LLC, 500 F. App'x 440, 446 (6th Cir. 2012) ("An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact.").

## 2. Reliability

In addition to being qualified, an expert must offer testimony that is reliable. Fed. R. Evid. 702; United States v. Cunningham, 679 F.3d 355 (6th Cir. 2012). District courts have "broad latitude" in determining whether a particular expert's testimony is reliable. United States v. Demjanjuk, 367 F.3d 623, 633 (6th Cir. 2004).

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." In re Scrap Metal, 527 F.3d at 529–530. Courts must assess whether the reasoning or methodology underlying the testimony is "valid" according to the discipline upon which it is based, Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012), and "'whether that reasoning or methodology properly can be applied to

the facts in issue,'" <u>United States v. Langan</u>, 263 F.3d 613, 621 (6th Cir. 2001) (quoting <u>Daubert</u>, 509 U.S. at 592–593)). Thus, reliability focuses on principles and methodology rather than results. <u>Superior Prod. Partnership v. Gordon Auto Body Parts Co., Ltd.</u>, 784 F.3d 311, 323 (6th Cir. 2015).

The inquiry of determining whether expert testimony is reliable "is a flexible one." <u>Daubert</u>, 509 U.S. at 594. When non-scientific expert testimony is involved, "the relevant reliability concerns may focus upon personal knowledge or experience." <u>First Tenn. Bank Nat'l Ass'n</u>, 268 F.3d at 335 (punctuation modified).

In contending that Story's testimony is unreliable, RenoSys asserts the following: when Story visited the pool, he conducted a perfunctory investigation without any particular methodology; he examined the pool only when it was drained; he did not take notes during his investigation; he was not able to determine the source of any leaking in the pool; he did not review any pool drawings, the RenoSys contract, or the RenoSys liner specifications, which would have revealed that certain issues he had with the installation were part of the project; and he does not perform pressure testing or leak testing. Mot. at 13–18. RenoSys conducts a granular review of Story's testimony, but the specific statements or inactions that it identifies as flaws go to the weight and credibility of Story's testimony, not its admissibility.

Story inspected various areas of the pool, identified what he believed to be deficiencies in the installation of the liner, and then, based on his knowledge of 60-millimeter pool liners and experience installing them, drew conclusions about how these deficiencies could have contributed to water getting underneath the liner. Methodology based on prior experience satisfies Rule 702, and Story's testimony "rests upon a reliable foundation, as opposed to, say, unsupported speculation." <u>In re Scrap Metal</u>, 527 F.3d at 529–530. With his inspection of the pool, knowledge,

and experience, Story's testimony is supported by "good grounds, based on what is known." Daubert, 509 U.S. at 590.

RenoSys's assertions that Story did not take notes during his investigation, examined the pool only when it was drained, or did not review pool drawings refer to purported weaknesses in his methodology. "Any weaknesses in his methodology will affect the weight that [an expert's] opinion is given at trial, but not its threshold admissibility." Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 182 (6th Cir. 2009). RenoSys also focuses on the fact that Story does not himself perform pressure tests or leak detection, but Story need not have experience with every aspect of leaks in pool liners for his testimony to be reliable. See Palatka v. Savage Arms, Inc., 535 F. App'x 448, 453 (6th Cir. 2013) (explaining that an expert's lack of testing of a proposed alternative could be highlighted on cross-examination to question the weight that should be given to the opinion but did not render the opinion inadmissible). Moreover, Story acknowledged the importance of conducting a pressure test when he explained alternative sources for the water underneath the liner.

Because Story is qualified and his testimony is reliable, the Court denies RenoSys's motion to disqualify Story as an expert.

### D. Motion to Strike Expert Report

RenoSys seeks to strike Story's expert report, contending that it does not comply with Rule 26. Mot. at 18–21.

Under Rule 26, a witness who is retained or specially employed to provide expert testimony in a case must submit a signed written report that contains the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;

17

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

Rule 26 requires a report to "be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial." R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 271 (6th Cir. 2010). It must be sufficiently complete "to shorten or decrease the need for expert depositions and thus to conserve resources." Id. Therefore, expert reports must include "'how' and 'why' the expert reached a particular result," rather than the expert's conclusory opinions. Id. An expert report must "set forth facts and in doing so, outline a line of reasoning arising from a logical foundation." Brainard v. Am. Skandia Life Assur. Corp., 432 F.3d 655, 664 (6th Cir. 2005) (punctuation modified).

If a party fails to provide information as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence . . . at trial, unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). To assess whether a party's omitted or late disclosure is "substantially justified" or "harmless," the Sixth Circuit considers five factors: (i) the surprise to the party against whom the evidence would be offered; (ii) the ability of that party to cure the surprise; (iii) the extent to which allowing the evidence would disrupt the trial; (iv) the importance of the evidence; and (v) the nondisclosing party's explanation for its failure to disclose the evidence. Howe v. City of Akron, 801 F.3d 718, 747–748 (6th Cir. 2015). The party in

violation of Rule 26 bears the burden to prove harmlessness or substantial justification.  Roberts
ex rel. Johnson v. Galen of Va., Inc., 325 F.3d 776, 782 (6th Cir. 2003) (punctuation modified).

Story's report does not comply with Rule 26.  The one-page report contains conclusory
statements, such as "[t]he liner should have been terminated above the waterline in the gutter" and
"[d]ue to the lack of quality, workmanship and incorrect installation techniques, the possibility for
water to continually get behind the liner is very high."  Story Report at PageID.217 (Dkt. 35-1).  It
also offers opinions without explaining their implications, such as the statements that Story
"[o]bserved multiple cracks and broken Faceplates & Flanges" and "[m]ultiple examples of
uneven cuts in the liner."  Id.  The report offers opinions without giving the basis and reasons for
them or the facts or data considered in forming them.  Moreover, the report does not list exhibits
that will be used to support the opinions, Story's qualifications, other matters in which Story has
testified, or compensation.

The City, therefore, can use Story's opinions only if the failure to comply with Rule 26 is
substantially justified or harmless.  The Court finds that the report's non-compliance with Rule 26
is harmless.  While Story's report lacks some information required under Rule 26, RenoSys has,
by now, had an opportunity to gather the missing information.  As the City points out, RenoSys
received the report before conducting Story's deposition, and it questioned Story about the report
during the deposition.  Story's deposition covered all of the statements contained in his report.

Further, there is little surprise to RenoSys from the report; RenoSys had the ability to cure any
surprise; and permitting the report would not disrupt trial.  See Roberts, 325 F.3d at 782 (finding
that the lack of an expert report was harmless because the plaintiff knew the expert's identity and
the substance of the expert's testimony and noting that the plaintiff waited five months to voice an
objection after not receiving the required disclosures); Mallco Co. v. Universal Granite & Marble,

Inc., No. 16-10010, 2017 WL 733247, at *4 (E.D. Mich., Feb. 24, 2017) (finding that party could not claim it was surprised by proposed expert's testimony when it knew the expert's identity and substance of his testimony months before objecting to a late disclosure). Specifically, several statements in Story's report, such as that the liner was terminated below the water line, that plastic anchors were installed, and that no gaskets were installed on the penetrations, have been apparent to RenoSys from the beginning. RenoSys also received the report before the deadline to file motions for summary judgment and before trial. It knows Story's identity and the substance of his testimony. And RenoSys waited over a year after receiving the report to object to it.

In addition, Story's testimony is important for the City, given that the City relies on it to rule out alternative explanations for the water underneath the liner and to contend that the liner was improperly installed.

The factors, therefore, weigh in favor of finding the City's non-compliance with Rule 26 to be harmless. The Court denies RenoSys's motion to strike Story's report.

### E.  Motion for Summary Judgment[4]

RenoSys states that it is entitled to summary judgment as to each of the City's claims. It asserts that all of the City's claims depend on the same factual assertions: (i) that RenoSys installers were either incompetent or installed the liner in an improper manner; (ii) that the liner was defective or of inferior quality; and (iii) that RenoSys did not use proper hardware for the installation. Mot. at

---

[4] In assessing whether Defendant is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

22.  It states that there is no genuine dispute as to these facts.  Id. at 22–24.  The Court addresses each of the City's claims in turn.

### 1. Breach of Contract

The City asserts a breach of contract claim, alleging that RenoSys breached the contract with the City by failing to complete its work by the scheduled deadline, failing to install the liner in a proper manner, and failing to prepare the pool properly for the liner.  Compl. ¶¶ 18–19, 28.  It alleges that, as a result of RenoSys's failure to properly install the liner, it sustained damages in the form of water usage associated with refilling the pool after RenoSys's attempted repairs, lost business revenue, loss of use of the leisure pool, and costs associated with removing the liner and remarciting the pool.  Id. ¶¶ 22–23, 26, 29.

Under Michigan law, a party asserting a breach of contract must establish by a preponderance of the evidence that (i) there was a contract (ii) that the other party breached, (iii) thereby resulting in damages to the party claiming breach.  Miller-Davis Co. v. Ahrens Const., Inc., 848 N.W.2d 95, 104 (Mich. 2014).

RenoSys focuses on the second and third elements.  It argues that without Story's testimony and report, there is nothing to indicate that the liner was improperly installed or defective.  Mot. at 23.  But even if the Court qualified Story and considered his report, it states, Story indicated that it appeared that RenoSys followed the "PVC Membrane Swimming Pool Lining System Specifications," which sets forth the proper installation procedure.  Id. at 22.  Kreppel, the lead installer for the project, testified to the same.  Id.  RenoSys also contends that there is no evidence of a causal nexus between (i) installation and/or the liner and (ii) the City's alleged damages.  Id.

There is a genuine factual dispute, which precludes granting summary judgment on the breach of contract claim, as to whether the liner was properly installed and whether the installation

resulted in the City's claimed damages. The City offers Story's testimony, which identified what he deemed to be deficiencies in RenoSys's installation that could contribute to water underneath the liner and which the City—in conjunction with other evidence, such as a pressure test performed in the pool—relies on to rule out explanations for the water underneath the liner other than the liner itself. Even without Story's opinions, the City offers sufficient evidence to establish a dispute as to either whether the liner was properly installed or whether the liner itself was defective, thereby resulting in damages. This evidence includes testimony of City employees that indicated that both the City and RenoSys knew there was water underneath the liner, that the liner separated from the bottom of the pool, that a leak-detection test identified leaks, and that RenoSys made several repairs to the liner but that the bubbling persisted. In fact, several factual disputes that bear on the breach of contract claim remain. The parties present evidence establishing a dispute as to the impact of the pool's return lines on the water underneath the liner; the findings and implications of the pressure and leak-detection test; and whether the use of plastic anchors, the lack of gaskets, and the termination of the liner below the water line constituted deficient installation. Therefore, RenoSys is not entitled to summary judgment on the breach of contract claim.

### 2. Breach of Express Warranty

The City alleges that RenoSys breached its express warranties in the following ways: using a liner that was of inferior quality and not fit for installation in the City's pool; hiring or assigning unqualified installers; and failing to use anchors, fasteners, and other materials that were not fit for the uses expressed in the specifications and contract. Compl. ¶ 37.

Under Michigan law, a seller of goods can create an express warranty in the following ways:

> (a) An affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) A description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the good shall conform to the sample or model

Mich. Comp. L. § 440.2313(1).  "An express warranty may be created only between a seller and a buyer, and any such express warranty becomes a term of the contract itself."  Heritage Res., Inc. v. Caterpillar Fin. Servs. Corp., 774 N.W.2d 332, 341 (Mich. Ct. App. 2009).  The plaintiff bears "the burden of establishing that defendants breached the written limited warranty, i.e., that during the period of the warranty defendants were notified of a defect that they failed to repair."  Gorman v. Am. Honda Motor Co., Inc., 839 N.W.2d 223, 226 (Mich. Ct. App. 2013).

RenoSys contends that nothing in the record supports the assertion that the liner itself was in any way defective. Mot. at 23.  It also argues that the testimony of Krepel, whom it states has been installing 60-millimeter PVC liners for decades and has not been sued, establishes that the installers were competent.  Id. at 23.

However, neither Krepel's testimony nor his past experience establishes the lack of a genuine dispute of material fact as to whether RenoSys used a defective liner on this specific occasion or did not properly install this specific liner.  With the testimony of Story and other City employees, the leak detection and pressure test reports, and the sequence of events in which RenoSys made several repairs to the liner but that the bubbling persisted, there is sufficient evidence to establish a material factual dispute as to whether RenoSys breached its express warranty by failing to install a watertight liner.  Therefore, RenoSys is not entitled to summary judgment on the breach of express warranty claim.

### 3. Breach of Implied Warranty of Merchantability and Breach of Implied Warranty of Fitness

The City alleges that RenoSys breached its implied warranty of merchantability and fitness because the liner was of such poor quality that it was not reasonably fit for its intended purpose in the pool and because it used anchors, fasteners, and materials that were improper and not reasonably fit for use in the pool.  Id. ¶¶ 41–43, 50.

Generally, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Mich. Comp. L. § 440.2314(1). Thus, "[e]very contract for the sale of goods carries an implied warranty of merchantability unless such warranty is excluded or modified."  Davis v. LaFontaine Motors, Inc., 719 N.W.2d 890, 895 (Mich. Ct. App. 2006).   Michigan courts have explained that the implied warranty of merchantability "requires that the goods sold be of average quality within the industry." Guaranteed Constr. Co. v. Gold Bond Prods., 395 N.W.2d 332, 335 (Mich. Ct. App. 1986). "Merchantable is not a synonym for perfect."  Id. at 332.  Under implied warranty theory, a defect is established by proof that a product is not reasonably fit for its intended, anticipated, or reasonably foreseeable use.  Elsasser v. Am. Motors Corp., 265 N.W.2d 339 (Mich. Ct. App. 1978).

While the warranty of merchantability requires that the goods sold be of average quality within the industry, the warranty of fitness for a particular purpose requires that the goods sold be fit for the purpose for which they are intended.  Guaranteed Constr. Co., 395 N.W.2d at 335.  To take advantage of this type of warranty, the seller must know at the time of sale the particular purpose for which the goods are required and that the buyer is relying on the seller to select or furnish suitable goods.  Id.

24

RenoSys again argues that there is nothing in the record to indicate that the liner or the materials used were not reasonably fit or to connect the liner or the materials to the City's alleged damages. Id. at 24. As noted, however, there is sufficient evidence to establish that material factual disputes exist regarding whether the liner was either defective or improperly installed and, therefore, not of average quality and not fit for use in the City's pool. Therefore, RenoSys is not entitled to summary judgment on the breach of implied warranty of merchantability claim or the breach of implied warranty of fitness claim.

### 4. Performance Bond

The contract between the City and RenoSys required RenoSys to obtain a performance bond as security for its "faithful performance" of the contract, and Merchants issued a performance bond. Aquatic Renovation Systems Contract at GC-10; Performance Bond (Dkt. 44-2). The City alleges that the materials and workmanship that RenoSys provided were of such poor quality and so deficient as to constitute a failure to perform. Compl. ¶ 56. It alleges that, pursuant to the performance bond, Merchants is obligated to compensate the City for the damages it sustained as a result of RenoSys's failure to faithfully perform. Id. ¶ 61.

Michigan courts have explained that "[a] suretyship contract requires three parties; a principal, an obligee, and a surety." Will H. Hall & Son, Inc v. Ace Masonry Constr, Inc., 677 NW2d 51, 55 (Mich. Ct. App. 2003). "A surety is one who undertakes to pay money or take any other action if the principal fails therein." Id. The liability of a surety is limited by "the scope of the liability of its principal and the precise terms of the surety agreement." Id. The liability of the surety is also coextensive with the liability of the principal in the bond. City of Ferndale v. Florence Cement Co., 712 NW2d 522, 528 (Mich. Ct. App. 2006).

Merchants offers two primary arguments related to the performance bond.  First, the City never provided Merchants an opportunity to perform on the bond.  Merchants' Concurrence and Supp. Reply at 1–2.  Second, when the City terminated the contract with RenoSys and entered into a separate contract with another entity to remarcite the pool, the City changed Merchants' obligations under the bond, and the obligations were thereby discharged.  Id. at 4.

Neither assertion indicates that Merchants is entitled to summary judgment on the performance bond claim.  There is a genuine factual dispute as to what type of notice the City provided Merchants regarding issues with the liner and with RenoSys's performance.  While Merchants states that the City did not provide Merchants an opportunity to complete performance, see Merchants' Concurrence and Supp. Reply at 1–2, the City states that, through multiple communications, it kept Merchants informed of issues with RenoSys's performance but that Merchants failed to act, see Resp. to Merchants' Concurrence and Supp. Reply at 2–6.

In addition, the evidence does not indicate that Merchants' obligations under the bond were discharged.  Merchants relies on § 41(b)(i) of the Restatement (Third) of Suretyship and Guaranty in asserting that the City formed a substituted contract when it entered into a separate contract with another entity to remarcite the pool and, therefore, "fundamentally changed" and released Merchants from its obligations.[5]  Merchants' Concurrence and Supp. Reply at 4.  But this provision

---

[5] This provision of the Restatement states the following:

> If the principal obligor and the obligee agree to a modification, other than an extension of time or a complete or partial release, of the principal obligor's duties pursuant to the underlying obligation: . . .
>
> > (b) the secondary obligor is discharged from any unperformed duties pursuant to the secondary obligation:
> >
> > > (i) if the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from

26

applies when "the principal obligor and the obligee agree to a modification . . . of the principal obligor's duties pursuant to the underlying obligation."  Restatement (Third) of Suretyship and Guaranty § 41(b)(i).  The evidence does not suggest that the City and RenoSys agreed to a modification of the contract.

Merchants is not entitled to summary judgment on the performance bond claim.

### III. CONCLUSION

For the reasons stated above, the Court grants the City's motion for leave to file a response to Merchants' concurrence with RenoSys's reply and supplemental reply (Dkt. 45).  It denies the City's motion for leave to file a response to RenoSys's reply (Dkt. 46).  It denies RenoSys's motion to dismiss as a sanction for spoliation, motion to disqualify the City's expert, motion to strike the expert's report, and motion for summary judgment (Dkt. 35).


SO ORDERED.

Dated: May 24, 2022                          s/Mark A. Goldsmith
       Detroit, Michigan                     MARK A. GOLDSMITH
                                             United States District Judge

---

those imposed pursuant to the transaction prior to modification[.]

Restatement (Third) of Suretyship and Guaranty § 41(b)(i).